James J.  Pisanelli, Esq., Bar No. 4027
JJP@pisanellibice.com
Todd L.  Bice, Esq., Bar No. 4534
TLB@pisanellibice.com
Debra L.  Spinelli, Esq., Bar No. 9695
DLS@pisanellibice.com
Jordan T. Smith, Esq., Bar No. 12097
JTS@pisanellibice.com
PISANELLI BICE PLLC
400 South 7th Street, Third Floor
Las Vegas, Nevada   89101
Telephone:  (702) 214-2100
Facsimile:   (702) 214-2101

Attorneys for Plaintiff Steven C.  Jacobs

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| STEVEN C.  JACOBS,<br><br>                              Plaintiff,<br>v.<br><br>VENETIAN MACAU LTD., a Macau<br>corporation,<br><br>                              Defendant. | Case No.:<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff, for his causes of action against Defendants, alleges and avers as follows:

**PARTIES**

1.     Plaintiff Steven C.  Jacobs ("Jacobs") resides in Florida and holds 100 shares of Defendant.

2.     Defendant Venetian Macau Ltd. ("VML") purports to be an indirect operating subsidiary of Las Vegas Sands Corp. ("LVSC"), a Nevada corporation with its principle place of business in Clark County, Nevada.

3.     From its inception, VML has been operated out of the offices of LVSC in Las Vegas, Nevada.  Although VML claims to have its own purported board of directors, that board did not and does not govern its actual affairs, as those are matters directed and controlled in Nevada.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, THIRD FLOOR
LAS VEGAS, NEVADA 89101

1

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, THIRD FLOOR
LAS VEGAS, NEVADA 89101

**JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, based upon diversity of citizenship and an amount in controversy exceeding $75,000.

5.      This Court has both general and specific jurisdiction over the Defendant, as its true corporate headquarters is Las Vegas, Nevada and the events giving rise to Plaintiff's claims occurred in Nevada.

6.      Venue is proper in this Court, the unofficial Southern Division, under 28 U.S.C. §1391.

**COMMON ALLEGATIONS**

7.      In 2003, LVSC acquired one of the all-lucrative gaming concessions in Macau. LVSC held that gaming concession in the name of Defendant VML.  According to LVSC, VML is the operating entity for its Macau gaming operations.  Upon its creation, VML was operated from Las Vegas, Nevada.

8.      By 2008, LVSC was facing serious financial problems acerbated by corporate infighting between LVSC's principal shareholder, Sheldon G. Adelson ("Adelson"), and its management team.

9.      Indeed, LVSC's Board members and senior executives internally expressed concern over Adelson's oftentimes erratic behavior, but failed to inform shareholders or take corrective action.  Adelson's behavior had become so corrosive that some government officials in Macau, LVSC's principal market, were no longer willing to even meet with Adelson.  On a fact-finding tour of Asia by select LVSC Board members and senior executives – where they met to discuss LVSC's declining fortunes with Asian business leaders and government officials – a common theme was that Adelson had burned many bridges in Macau and specific reference was made to an often-discussed confrontation between Macau's then-Chief Executive, Edmund Ho, and Adelson. Indeed, in the fact-finding tour's meeting with Chief Executive Ho, he informed the LVSC executives of his views that while Adelson had done much to improve Macau's economic fortunes, the time had come for him to spend more time with his family and leave the company's operations to others.  Translated into blunt businessman's terms:  Adelson needed to retire.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, THIRD FLOOR
LAS VEGAS, NEVADA 89101

10.     Adelson's behavior did not just alienate outsiders, it effectively paralyzed the management.  LVSC faced increased cash flow needs, which, in turn, threatened to trigger a breach of the Company's maximum leverage ratio covenant in its U.S. credit facilities.  Due to Adelson's erratic behavior, LVSC's then-president and Chief Operating Officer William Weidner ("Weidner") lost confidence in Adelson's abilities, and undertook steps that Adelson would characterize as an attempted coup.  Weidner sought Adelson's removal as CEO.  Because Adelson controls more than fifty percent (50%) of LVSC's voting power, Adelson forced Weidner's removal from the company so as to preserve his own control.

11.     In March 2009, Weidner was replaced as President and COO by Michael Leven ("Leven"), a member of LVSC's Board of Directors.

12.     Because of the dysfunction and paralysis Adelson created, LVSC failed to access capital markets in a timely fashion, which then forced the company to engage in a number of emergency transactions to raise funds in late 2008 and early 2009.   Ironically for LVSC's shareholders – all of those except for Adelson, that is – this unnecessary delay resulted in Adelson's personal wealth as the financing source for a quick influx of liquidity.  But, to access those funds, Adelson would charge LVSC a hefty price, obtaining convertible senior notes, preferred shares, and warrants.  Later, Adelson would reap a staggering windfall as a result of these highly-favorable (for him) financing terms.  Conveniently, Adelson was the principal beneficiary, to the detriment of all other shareholders, of the very financial calamity that he helped create.

13.     It is in this poisonous environment that Jacobs enters the LVSC picture.  Even before Leven became LVSC's President and COO, he had reached out to Jacobs to discuss potential COO candidates to replace Weidner.    Leven and Jacobs had known each other for many years having worked together at U.S. Franchise Systems in the 1990's and in subsequent business ventures thereafter.  When Leven received an offer from LVSC's Board to become the company's President and COO, he again reached out to Jacobs to discuss the opportunity and the conditions under which he (Leven) would accept the position.  The conditions included but were not limited to Leven's compensation package and a commitment from Jacobs to join Leven for a period of 90-120 days to "ensure my [Leven's] success."

3

14.     Jacobs travelled to Las Vegas in March 2009 where he met with Leven and Adelson for several days to review the company's Nevada operations.  While in Las Vegas, the parties agreed to a consulting contract between LVSC and Jacobs' company, Vagus Group, Inc.  Jacobs then began assisting LVSC in restructuring its Las Vegas operations.

15.     Jacobs, Leven, and Adelson subsequently travelled to Macau to conduct a review of LVSC's operations there.  While in Macau, Leven told Jacobs that he wanted to hire him to run LVSC's Macau operations.  Jacobs and Leven returned to Las Vegas after spending approximately a week in Macau.  Jacobs then spent the bulk of the next 2-3 weeks working on the Las Vegas restructuring program and also negotiating with Leven regarding LVSC's desire to hire him as a full-time executive.

16.     On May 6, 2009, LVSC announced that Jacobs would become the interim President of Macau Operations.  Jacobs was charged with restructuring the financial and operational aspects of the Macau assets.  This included, among other things, lowering operating costs, developing and implementing new strategies, building new ties with local and national government officials, and eventually spinning off the Macau assets into a new company to be taken public on the Hong Kong Stock Exchange.

17.     Notwithstanding that Jacobs would be spending the majority of his time in Macau focusing on LVSC's operations in that location, he was also required to perform duties in Las Vegas including, but not limited to, working with LVSC's Las Vegas staff on reducing costs within the Company's Las Vegas operations, consulting on staffing and delayed opening issues related to the company's Marina Bay Sands project in Singapore, and participating in meetings of LVSC's Board of Directors.

18.     On or about August 4, 2009, Jacobs and LVSC entered into an employment agreement for Jacobs to serve as president and CEO of its Macau operations.  That employment agreement is and was commonly referred to as the "Term Sheet."  That Term Sheet was made and entered into in Nevada and is governed by Nevada law.

19.     While Jacobs' employment agreement was with LVSC, it directed VML to pay Jacobs' salary.  On or about October 6, 2009, Jacobs was also granted 100 shares in VML, shares

4

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, THIRD FLOOR
LAS VEGAS, NEVADA 89101

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, THIRD FLOOR
LAS VEGAS, NEVADA 89101

1    which he continues to hold to this day, as VML has repeatedly acknowledged including as of

2    December 2015.

3         20.    On July 23, 2010, Jacobs was fired by LVSC in an attempt to cover up a host of

4    improper activities which Jacobs has outlined in other litigation and to government regulators.  In

5    attempting to defend its improper conduct in the action Jacobs has filed against it – *Steven C. Jacobs*

6    *v. Las Vegas Sands Corp., et al.*, Case No. 10-A-627691, pending in the Eighth Judicial District

7    Court, Clark County, Nevada – LVSC has now asserted that the obligations and liability for Jacobs'

8    employment agreement were somehow transferred to, assigned, or assumed by, VML.

9         21.    Attempting to save itself for its breach and misconduct, LVSC has attempted to shift

10   liability on to VML, claiming that since it directed VML to pay the salary of Jacobs' employment

11   agreement, VML alone is liable for any breach, notwithstanding that it made the contract with

12   Jacobs and it orchestrated the wrongful termination in Nevada.

13        22.    Indeed, Adelson and Leven went so far as to fabricate purported "for cause" reasons

14   for Jacobs' termination in Nevada and later had them printed on VML letterhead and sent to Jacobs

15   weeks after he had already been wrongfully terminated.  Because those reasons are demonstrably

16   false, Adelson has over time had to resort to additional fabrications in an attempt to cover his tracks

17   and those of the companies he controls.

18        23.    This occurred in spite of the accomplishments for the four quarters over which

19   Jacobs had presided created significant value for LVSC and Adelson.   From an operational

20   perspective, Jacobs and his team removed over $365 million of costs from LVSC's Macau

21   operations, repaired strained relationships with local and national government officials in Macau

22   who would no longer meet with Adelson due to his obstreperous behavior, and refocused operations

23   on core businesses to drive operating margins and profits, thereby achieving the then-highest

24   EBITDA figures in the history of the company's Macau operations.

25        24.    Due in large part to the success of its Macau operations under Jacobs' direction,

26   LVSC was able to raise over $4 billion dollars from the capital markets, spin off its Macau

27   operations into a new company – Sands China Limited – which became publicly traded on the

28   Hong Kong Stock Exchange in late November 2009, and restart construction on a previously stalled

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, THIRD FLOOR
LAS VEGAS, NEVADA 89101

1    expansion project on the Cotai Strip known as "Parcels 5 and 6." Indeed, for the second quarter

2    ending June 2010, net revenue from Macau operations accounted for approximately 65% of LVSC's

3    total net revenue (*i.e*., $1.04 billion USD of a total $1.59 billion USD).

4          25.    To put matters in perspective, when Jacobs began performing work for the Company

5    in March 2009, LVSC shares were trading at just over $1.70 per share and its market cap was

6    approximately $1.1 billion USD.  At the time of Jacobs' departure in July 2010, LVSC shares were

7    over $28 per share and its market cap exceeded $19 billion USD.

8          26.    Jacobs' success was repeatedly confirmed by Board members of LVSC as well as

9    those of the new spinoff, Sands China.  When Leven was asked in February 2010 to assess Jacobs'

10   2009 job performance, he advised:  "*there is no question as to Steve's performance[;] the Titanic*

11   *hit the iceberg[,] he arrived and not only saved the passengers[,] he saved the ship.*"

12         27.    But Adelson would make sure that Jacobs was cheated out of what he was owed, a

13   practice that Adelson has honed in dealing with many executives and companies that refused to do

14   as Adelson demanded.

15         28.    Jacobs was not terminated for cause.  He was terminated for blowing the whistle on

16   improprieties and placing the interests of shareholders above those of Adelson.  Indeed, in just one

17   candid communication Leven sent to executives (including Adelson) just days before Jacobs'

18   termination, Leven claimed that the problem with Jacobs was that "he believes he reports to the

19   board, not the chair [Adelson]."

20         29.    Because LVSC has sought to avoid its obligations and wrongdoing by pointing the

21   finger at VML, Jacobs brings this action.

22         **CAUSE OF ACTION**

23         30.    Plaintiff restates all preceding and subsequent allegations as though fully set forth

24   herein.

25         31.    Jacobs entered into a valid and binding agreement with LVSC governing the terms

26   and conditions of his employment.

27         32.    According to LVSC, it assigned to and/or VML assumed the contractual obligations

28   of Jacobs' Nevada employment agreement.

6

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, THIRD FLOOR
LAS VEGAS, NEVADA 89101

33.   Jacobs performed all of his contractual obligations except where excused.

34.   VML has breached all its obligations to Jacobs.

35.   VML is thus liable for all natural and foreseeable consequences of its actions, which exceed the value of $75,000.

## JURY DEMAND

Jacobs demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against VML, as follows:

1.   Compensatory damages as determined at trial;

2.   Pre-judgment and post-judgment interest, as allowed by law;

4.   Attorneys' fees and costs of suit incurred herein, as allowed by law, in an amount to be determined; and

5.   For such other and further relief as the Court may deem just and proper.

DATED this 29th day of January, 2016.

PISANELLI BICE PLLC


By:   /s/ Todd L. Bice
          James J. Pisanelli, Esq., Bar No. 4027
          Todd L. Bice, Esq., Bar No. 4534
          Debra L. Spinelli, Esq., Bar No. 9695
          Jordan T. Smith, Esq., Bar No. 12097
          400 South 7th Street, Suite 300
          Las Vegas, Nevada   89101

Attorneys for Plaintiff Steven C. Jacobs